I brought some charts, but I also have small versions if you want to look at them. Your Honor, we can read it. Good morning, Your Honors. My name is Peter O'Neill, and I'm one of the attorneys for the Jaramillo family, and I was also one of the trial attorneys in this case. It involves the on-road rollover of a Ford Explorer, and the appeal addresses evidence that Ford presented at trial of dissimilar incidents or dissimilar crashes involving dissimilar vehicles. We believe that the evidence was admitted in error and was harmful, and we're asking this Court to reverse and to remand for a new trial. The legal issue here is the requirement for substantial similarity where a party seeks to admit evidence of other incidents, including statistical evidence. And in this trial, Ford presented statistical evidence that described a huge number of very dissimilar vehicles that were involved in a variety of dissimilar collisions. And now by citing to a footnote in one case in another circuit, Ford's asking the Court to create a new distinction and to put plaintiffs and defendants on an unequal footing with this sort of evidence, and we believe that's not fair. The established law for all parties, for proponents, for plaintiffs, for parties, for defendants, says that the proponent of evidence of other incidents must show substantial similarity in terms of the facts or the product and also in terms of the circumstances. And the circumstance of this crash was an untripped on-road roll caused by tire friction. The Explorer didn't go off-road. It didn't dig into the earth. It didn't hit a curb or slide off a hill. Mrs. Jaramillo steered to avoid some deer, and the friction of her tires caused the vehicle to roll over because the Ford Explorer has a high center of gravity and a narrow track width. Track width is the distance between the right and the left tires. And it's undisputed that in different sorts of accidents, any vehicle can wind up rolling over, if it does go off the road or if it hits a curb or a guardrail. But plaintiff stability expert and actually Ford, too, agreed that a passenger vehicle that's properly designed, if it goes sideways on pavement, should slide out. This was Ford's document that was sent to the federal government in 1973, and it said that passenger cars must be forgiving of all manner of unskilled driver situations. And at the end it says, Ford passenger cars are designed to forgive or, in the extreme, to slide out rather than roll over on flat-level pavement. And that's what was needed here. The Explorer is designed to carry passengers. It was marketed to families like the Jaramillos. And according to Ford's own standard and our expert, it shouldn't have rolled under the circumstances of this crash. The jury in this case deliberated for five full days. Ultimately, there was a verdict for Ford, but that long deliberation indicates that it was a close case. And the trial judge acknowledged this in his order reducing Ford's cost bill. And since the burden of proof in a civil case is a mere preponderance, then in a close case even a small amount of wrongly admitted evidence can tip the balance. And here there was much more than that. Most of it came at the close of Ford's case, and it tipped the balance against the Jaramillos. Did they argue this in their closing argument? I don't recall whether it was argued in the closing argument. Most of the closing argument has to do with me, as I recall. But I think that the failure to show – it was a huge part of the close of the case, and it was the last two experts, actually, who used these dissimilar incidents. What I do believe is that this – Do you contend that none of this was relevant? That none of this – I think that other incidents – They're comparative. I think that other incidents could be relevant if you follow the rules of substantial similarity, if they compared apples to apples. But what they do here is I think they mix the apples with oranges and lemons and everything else, and they come up with something where you can't distinguish these different flavors. Here we've got premium sport, full-size van, sporty car, large car, pickup, small van, SUV, which are all lumped together in one group. The interesting thing about her statistics is she'll break out small car, large car, midsize car, but she puts all the SUVs in one group. Well, how do you get around the objection that you started this line of questioning when you examined the Ford employee? When we did that, we were examining the Ford employee based on Ford's own documents. I think I've got one of them here. This is just an example. Ford, as it was designing this vehicle, compared it with the competitive vehicles. And we were using what I think is real state-of-the-art or custom in the industry. We were looking at Ford's own documents where they compared the Explorer, the U.N. 46, to the Bronco 2, to the Blazer, to things like this. We weren't trying to judge whether the Explorer was better or worse than these, but Ford was at the time that it was designing the car. One of the places they cite many such examples is around page 34 or 35 of Ford's supplemental record. And all of those come from a truck safety design guideline, where Ford, in its truck safety design guideline, compares the rollover rates of passenger vehicles and trucks and says, we've got to make our pickups and our trucks, like the Explorer, perform like our passenger cars. But I don't think that we never tried to compare the Ford Explorer to any other vehicle in its performance, except the Bronco 2. And that is only to the extent that the Ford Explorer was a redesign of the Bronco 2. They widened the track by two inches. They lengthened it by one or two inches. Otherwise, it was the same vehicle. And Ford's documents called it the 1990-and-a-half Bronco 2. One of the problems with Dr. Vogler's analysis is she doesn't restrict it. You asked whether it could be relevant. And yes, I think she restricted it as on-road rollovers that are caused by tire friction. That would be relevant, possibly, because that is the defect that we're alleging. As I said, any vehicle can roll under certain circumstances. Here is the cross-examination of her. Have some driven off cliffs? Yes, they could. And some have been involved in collisions with other vehicles. Yes, they could. Could it be curb strikes and trips? Yes, they could. Hitting a guardrail and tripping? Yes, they could. Well, any vehicle can roll under these circumstances. But only a vehicle that's too tall and too narrow will roll because of the tire friction. Could I clarify one point to follow up on Judge Noonan's question? During your affirmative case, during your part when you were presenting your evidence, did you offer evidence of a comparative nature? No, we didn't, Your Honor. We tried very hard not to do any such thing, and I was afraid to. I wish I could have. But there are vehicles which I think perform better. But we tried very hard not to because we didn't want to open the door. The only other documents mentioned to the jury. The only time this came out was when you were cross-examining Ford's experts? Cross-examining Ford's 30B6 witness. As part of their case? No, as part of our case, but using Ford's documents. Only cross-examining them about Ford's documents and about the design of the Explorer and what they were looking at at the time that they were designing the Explorer. And some of those documents, some of Ford's documents talk about, mention Ford's data or mention these sorts of other vehicles that I showed you here, but I did not, and we never did compare it to any other vehicle in our case in chief. You didn't compare the individual vehicle, but you compared categories of vehicles. By asking him to read the Ford reports, which described the relationship vis-à-vis the various categories of vehicles. Well, we only recognized one category of vehicle, to be honest, because what we recognize is a vehicle that's designed to carry families and passengers. And in the old days, some of the older Ford trucks were designed, they were considered commercial vehicles. They really had a different standard. They expected commercial drivers. By the time this vehicle was being designed, Ford was beginning to sort out that distinction. That's why its safety design guidelines said, we must build these things to act more like passenger cars. Since this vehicle, a big part of our case was the marketing to this Jaramillo family. It was a truck that was her car that was driven by the mom primarily to cart her family around. The Ford Explorer ad showed this kind of thing. Part of our case was this marketing to families of a passenger vehicle. So we certainly didn't make any distinctions like this where she's talking about all these different sized kinds of vehicles and dividing them up in her own distinct ways. We simply tried to stress the fact that this vehicle, though built on a truck chassis, was sold as a passenger vehicle. One of the reasons why I think this can be so devastating to us, I'd like to use an example. Imagine, we all know that cigarettes kill hundreds of thousands of people a year through cancer or emphysema or heart disease. Imagine somebody makes a cigarette that they consider more useful because it ignites itself.  But it turns out on the market that another 35 or 40 people are killed every year because of this self-igniting cigarette. It blows up in their faces. Defending a product liability case based on that, the manufacturer could say, well, look at this overall injury rate for cigarettes. And the 35 additional deaths caused by this exploding cigarette would be negligible. They'd hardly be noticed. And really that's what Ford is doing here, saying, you know, overall our pick-up or our Explorer is doing fine, but they're therefore erasing, sandpapering away this critical distinction that this vehicle has a defect which causes it to roll over when other vehicles will not roll over. Ford says that defendants as a class are immune from the requirement to prove substantial similarity. And we think that would obviously be unfair if it were somehow true, but it's not true. Ford supports its case with that one footnote in Troll, whereas the vast majority of cases say the proponent of the evidence must prove the substantial similarity. Ford also says that a comparative risk analysis is different, that substantial similarity is only required where it's being used to prove defect. But Ford's trying to prove a lack of defect. They're using these statistics of every imaginable sort of accident to sandpaper the differences between these vehicles and say that their vehicle is not more dangerous overall, that it's not defective, so that it's the same thing. They're trying to do that. Wasn't there something in the record by your expert who testified or opined that any vehicle that rolls over is dangerous? He said that any vehicle that can roll over because of steering alone. Steering alone. Steering alone on smooth, dry pavement. And that's what happened in this case and so many other cases. This vehicle didn't leave the road. Any vehicle can roll over once it does leave the road. And that's a whole different ball of wax. Doctor, one problem with Dr. So any passenger car that rolls over is dangerous? Say in a similar. If it rolls over and it has a weak roof, it's dangerous. If it goes off road and rolls, any passenger car can roll over off the road. It can dig into the soft earth and furrow in until the wheels create what they call a dam of earth and then it rolls over. That's two separate things. You're saying that any passenger, any car that rolls over without leaving the road, just rolls over on a dry road, is dangerous? Or are you saying it's only dangerous if it also has a weak roof? Well, we had both elements in our case. But Judge Paez asked about a passenger car that rolls over. Is that dangerous? It's not dangerous because of the stability factor. But if the person has killed that weak roof or some other defect, there are rollover cases that involve passenger cars that they all start either with a collision or going off the road. What was the point of the experts? That's what I'm saying. You are saying, or aren't you, to get the ones that are an accident or that go off the road. As far as just rolling over without going off the road, are you saying that in itself makes it dangerous? Yes, that's the defect that we allege here. If it's tripping because of tire friction alone. And then separately and independently or cumulatively, if it also has a defective roof, that's – but either one would be a violation? Yes. But the case here, what's on appeal here is the statistical evidence relating to stability. Let me ask you another question about your case. You had claimed that the roof of the vehicle was defectively designed. Yes. I gather your theory was that even if it had – if it didn't have a propensity to roll over, you know, its design, its stability design was not a problem, that nonetheless the roof was defectively designed. We felt that in a case involving a vehicle that does have a propensity to roll over, you've got to make the roof all the stronger. And this roof collapsed instantly, allowing her head outside the vehicle. So it is a secondary defect in this case, but what we were presenting – It wasn't a primary – it wasn't a primary – Our primary defect was the rollover stability. Is that the same – is that true for the seatbelt as well, for the child in the backseat? Yes. I think that would be a secondary – in other words, once you're in a crash, you've got to rely on these safety features of the vehicle, whether it's the roof or the seatbelt. This crash, though, was only started because of the defective nature of the vehicle. And one thing about Dr. Vogler's statistics is she doesn't look at roof strength. She doesn't look at anything like that. She's not comparing apples to oranges or apples to apples. And that's what becomes so overwhelming. Well, I gather the argument was that the seatbelt was not designed to withstand this kind of roll. The seatbelt's not on appeal here, I guess, but the seatbelt was a difficult issue at trial. I wish we hadn't tried it. It sprung itself open during the thing because it bent. It deformed. It kind of pushed a button in the seatbelt, and that little girl was lost that way. I think it was too much evidence at this trial. I wish I hadn't presented it. At any rate, Your Honors, I see that I've got about five minutes left, and if it's okay, I would like to reserve that for rebuttal. All right. Thank you. May it please the Court, my name is Dan McAuliffe. I'm here for Ford Motor Company. Judge Pius, if I could, while it's fresh in our minds because you asked the question, let's read what Mr. Anderson actually said. Question. Let me get it clear. Is it your testimony to this jury that if a human being with any steering at all, at any speed at all, can make a vehicle roll over, that it's defective? Answer, yes. And that's page 621, excerpt of record, looks like 69. I read that. The principal issue on this appeal is whether it was an abuse of discretion to admit Dr. Vogler's testimony. He's only shown you some very limited excerpts from what Dr. Vogler testified to. Dr. Vogler presented, explained, and defended an analysis, statistical analysis, based on data that really wasn't subject to question. She relied on the FARS database maintained by NHTSA. She relied on databases maintained by six States. I think the main question was not so much the accuracy as the relevance or the propriety of that type of evidence. That is the issue. No question about it, Judge Reinhart. Is it probative? Is it relevant? And for that, because as a diversity case, we look to the Washington statute. And the Washington statute says, uses the test reasonably safe, and defines in subpart A that it's not reasonably safe as designed if the likelihood that the product would cause the claimant's harm or similar harms outweighed the burden on the manufacturer to design a product, the likelihood. And the Washington Supreme Court, in a case referred by this Court to it, said, you know, you can take a look at what other products do. It was a pesticide case. In terms of whether there's an alternative design, whether the product that's being challenged is or is not reasonably safe. This testimony goes directly to that. How likely is it that something bad is going to happen when you're driving a forged board? I don't understand, and the district judge seemed not to either originally. What the relevance is of the likelihood of a car turning over, what difference it makes that another brand of car is going to turn over more or less frequently? How does that make it more or less likely that car A is going to turn over? Because the jury is, under the Washington statute, I think the jury is committed to the issue of risk. What we're talking about is risk tolerance here. Yeah. And that issue is committed to the jury. Yeah. And I think it is relevant for them to know. But how does this help them? It helps them to know that the Ford Explorer falls within the middle of the pack. Okay? And actually, the evidence showed, Dr. Vogel's evidence showed that SUVs have a greater tendency to roll over than other classes of vehicles. So it's not particularly helpful, but that's what it showed. All right? But it helps to show that they're in the middle of the pack so the jury can make a judgment this is reasonably safe. Maybe all SUVs are unsafe. How does it help to be in the middle of the pack? That is what the expression of the trial judge in the motion in limineum, if you take this out logically, if it rolls over 95 percent of the time, then it's reasonably safe. First of all, I don't think there's any jury in the State of Washington or any other State that's going to look at evidence that shows that a vehicle rolls over 95 percent of the time and by the argument that that's reasonably safe. No, no. You're right. Absolutely right. Nor do I think a defendant's going to put it on, but I think the plaintiff might put it on. But what difference does it make, as Charles said initially? What difference does it make that there are other SUVs that are even less safe or even safer, however you look at it? I guess what you're supposed to do, and this is not an easy question, the jury is supposed to decide how many lives do you give up in order to have SUVs. Does society want SUVs that kill 10 percent of the people, 2 percent of the people, 50 percent? But I don't quite see the relevance of that question, the relevance to the answer to that question of saying, well, other SUVs kill more people or fewer people, or other cars kill more or fewer people. The only question really is do you want to accept a 10 percent death rate or a 2 percent death rate? Well, in terms of how much of a death rate, you know, it gives me chills to be articulating that concept. We do leave that to juries to decide. But on the other hand, it's a judgment we make every day. Okay. You know, when I leave here, I'm going to go out and I'm going to get on an airplane. Okay. John Madden chooses to take a bus. Right. And what's the judgment that's being made there? Let's hope that bus doesn't crash. The judgment that's being made there is that statistically we know that one of the safest ways of travel from place to place is the airlines. But we also know that airplanes crash. Okay. And, you know, I don't want to be in an airplane, but I make that judgment based on the same type of analysis that says to me, okay, an airplane is safer than a car. An airplane is safer than a bus. An airplane is safer than a train. Our statistics show us that. I don't see why a jury can't make that judgment. I think the Ruiz-Guzman case clearly allows them to, because it says you can show how an alternative product performs. And these are jurors who are walking the streets of Tacoma every day. They see what's out there on the road. And if they see, wait a minute, this is not out of line with other things that are out there on the road. But why shouldn't we say, why shouldn't the jury be able to conclude all SUVs are really too unsafe? Some juries could. So all I need to know for that really is let's say they know that half of the SUVs end up killing people. I know that's not the case. Suppose that were the case. What difference does it make that some kill 60, some kill 40, some kill 20? Doesn't the jury make the judgment as to the particular SUV that has an X rate, whether that rate is too much to accept, that that's too much of a defect? I think when you add to the statute likelihood and the concept of reasonably safe, okay, you invite comparisons with other SUVs because. Let's take it one step further. Okay. Let's assume that you do invite comparisons. Then the next argument, and that's what really the case comes down to, I think, was a substantial similarity argument. Why is it that we're not looking, as counsel said, it was an interesting example, we're not looking at how unsafe each brand of cigarettes is. If there's one brand that is particularly unsafe in a particular respect, is that not the appropriate test? Well, I have two answers to that question. First of all, I think the substantial similarity test was essentially met here because Dr. Vogler did isolate for the jury in a chart that Mr. O'Neill did not show you, but is in the record. Did isolate. And this was the principal focus of her testimony. Did isolate for the jury what happens with 1995 to 1994 Ford Explorers, which is the exact vehicle that the Jamarillos were driving. But from all kinds of accidents, hitting other cars, not turning over because of. She isolated rollover rates. Yeah. Rollover. Rollover rates. All cars off the road, on the road, accidents, hitting a curb. Which really helps Mr. O'Neill, because if you want to start carving out of that, right, accidents which occurred because of something other than the circumstances which caused this accident, the number goes down. It doesn't go up. The number goes down. But the comparative number may go up. It may not be.  It couldn't possibly, because you're taking out of the universe. She's taking here's the total number of rollovers. Here's the number of times this car has driven on the road. And here's the number of times. Here's the quantified risk. But when we talk about a comparison, you have A and B. They may look like they each rollover 20% of the time. But if you look at the rollovers resulting from inability to stay on the road, as opposed to rollovers from accidents, A may still have the same 20%, and B may go down to 5%. I disagree, Judge Reinhart. If you take the universe of all rollovers, and then you say, as Mr. O'Neill says, no, you've got to take out of that accidents which occurred under dissimilar circumstances, then the percentage of times that that accident occurs goes down. Yes. It will go down for both car A and B. And in one case, it may go down from 20% to 18, and in the other, it may go down from 20% to 2. So the comparison is no longer valid. If the issue is the defect is the stability, and in one case of automobile A, all of the accidents come from that, and in the case of automobile B, only a quarter of the accidents come from that, then the comparison is meaningless. I still think the comparison is not perhaps as precise as you'd want it to be, but I think the comparison still is meaningful under the terms of the statute. The second answer to the question is that the substantial similarity test is really just a filter to determine what's probative, where a plaintiff is offering evidence of other accidents to show that there's a defect in the car. The defense is trying to prove something else. Okay. They may be trying to prove there's no defect. They're also trying to prove that the car is reasonably safe. The defense is not going to put on evidence of accidents, except in very limited circumstances. In the Heath case we saw, it showed what the dynamics were all over the world. But reasonably safe. See, this is the question, and this is what was interesting about the cigarette analogy, which is why I wanted your response to that. If you're alleging the defect in the car is stability, you're talking about a particular defect that causes certain accidents. Now, is it an answer to say that overall the car is a safe car, not just for rollovers, but for everything? It's a comparatively safe car compared to something else. Does that answer the question of whether a particular defect makes a car particularly unsafe in a particular respect? I think it depends on the case you're defending. In the case that we were defending here, okay, in opening statement, in Mr. Anderson's testimony, the testimony was, if this car rolls over, it's defective. That was the theory of their case. If the car rolls over, it's defective. And this evidence shows what's reasonably safe in terms of rollovers. I think it's also pertinent to the fact that there was in this case an allegation, a claim of a post-sale duty to warn, which under the statute points you to a reasonably prudent manufacturer should have learned about a danger connected with the product  This is exactly the type of evidence. First of all, it's the evidence that NHTSA looks at. It's the evidence that insurance companies look at. It's the evidence that a reasonably prudent manufacturer is going to look at to determine, do we have a problem here? Should people be warned? Should we put out maybe a recall? Well, you can look at two different problems. Do we have a general rollover problem, and do we have a stability problem because there's particular types of rollover? And you might then give a different type of notice or warning. That's correct. But this is the type of evidence that tells you you ought to start taking a look at it, and this was the claim that was in front of this jury. What would a reasonably prudent manufacturer do? And if a reasonably prudent manufacturer takes a look and sees that the numbers show that the car is not rolling over anything out of the ordinary, and as a matter of fact, with other things that fall within the Federal definition of SUVs, it's probably in the middle of a pack, then the jury can, I think, is entitled to decide that a reasonably prudent manufacturer would not have issued a warning. But I think they need to know what the evidence is that's in front of that reasonably prudent manufacturer in order to make that determination. The final point that I wanted to make, because I see my time's running out, is that this issue did not arise in a vacuum, either. The jury heard a lot of evidence offered by plaintiffs about rollover rates, about rollover rates for SUVs in general. Mr. O'Neill wants to tell you that it was a Ford witness who was testifying and that the examination concerned a Ford document. Mr. O'Neill called that witness. Mr. O'Neill conducted that examination, and that examination consisted of, and I'm quoting, asking about rate of fatalities for small utility vehicles exceeding all other types of vehicles. Well, all of this is coming out of a Ford study, right? But the plaintiff put it on. Yes. No, no, I understand that. The plaintiff called the witness and he asked the witness about what the Ford study had showed. Exactly. And that, as I understand, that that study was done to help Ford improve the safety of the Explorer to make it better than the Bronco, or to make the Bronco better than it was at some time in the past. It told them the things that they needed to look for to create a safer car. And Ford, for that purpose, looked at some comparative data. Yes, I think that's fair. But they treated the Bronco II and the Ford Explorer as being essentially the same vehicle in terms of the theory of their case. And then they were shown a Consumer Reports article which said, which compared rollover rates for the Bronco II to those for the Chevy Blazer, the GMC Jimmy, and for the Jeep Cherokee. So if we now want to respond and say, now let's tell them what the true facts are, not what's in some Consumer Reports article, I think we're entitled to it. And I don't think it's an abuse of discretion for the trial judge to permit us to do that. Are there any other questions? That's really all I had planned to ask. Thank you very much, counsel. Thank you, Your Honor. Your Honors, we never said that if a car rolls over, it's defective. We said if it rolls over on smooth, dry pavement because of steering, it's defective. Can you tell us exactly where that question and answer are in the record? The one that I think you were talking about, the same statement. I think it was said throughout the record. In opening, he mentioned an opening argument. I was trying to find that, if that's of any value. On page, it's Ford's, so I guess it's the supplemental excerpts of record 27. And I say, Mr. Anderson, he will tell you that a properly designed vehicle, especially for families, should not roll over on smooth, dry pavement. But what about the witness who said every time a car or vehicle rolls over? Never was said. That's what I was responding to. It never, ever was said. So your recollection is that whenever it is with a statement that it's always any rollover, that the testimony was any rollover on a dry road without going off, the different thing. And that did, the expert said, if it can be rolled over by steering alone. In other words, on smooth, dry pavement, you make steering. If it tips up, that's defective. What about the comparison the counsel talks about in the Consumer Reports where you compared overall rollover rates? Well, the Consumer Reports was produced to us by Ford, and it came with many documents, their own documents, talking about this visit to Consumer Reports. And what it was really talking about was putting the consumer, putting the Explorer in context of the Bronco II, and that's why it was introduced. But there was a Consumer Reports article. Did you introduce it or did they introduce it? Pardon? I understand it came with a Ford document. Did you introduce it or did they? Yes. It was introduced during our cross-examination of the Ford witness, Mr. Pasquarello. You introduced the Consumer Reports. Yes. All right. Yes. And was that a comparison of overall rollover rates, not rather than the type that you're saying it should be limited to? It was actually, I think it was talking about rollover fatality rates. And in Ford's own documents also, it was corroborating or vice versa, Ford's own documents. Well, what's your answer to the fact, to the theory that if you told the jury, here are the overall rollover rates to show that the Bronco or the Explorer were high, that they had a right to introduce evidence that shows that they weren't high? Well, if we introduced it at all, it was talking about only a comparison between SUVs of a similar class. It wasn't true. And if you did, you did introduce it? Well, we introduced an article, and it has some information about it. You introduced it. Why make it conditional? Well, okay. Well, did somebody read something? You introduced the article, but did somebody read the comparison rates or ask about those rates? I think there was sentences, there was a sentence in the article about that, yes. Well, that was your sentence in the article. A witness asked about the sentence in the article. Yes. Yes, Your Honor. Our primary fundamental problem with this, we talked about rollover rates, or we talked about the Explorer being in the middle of the pack. And the primary problem here is that the pack is too large. It includes everything under the sun and every sort of crash under the sun. Certainly, Consumer Reports didn't go that far. This case shouldn't have gone that far. When you make the pack so big and you put the Explorer in the middle of it, it becomes meaningless. Now, I take it you argue that to the jury? I didn't review my argument to the jury at the end in preparation for this, and so I don't want to say yes or no. If you thought that was an obvious mistake, you must have commented on how this was an unfair comparison. No. I think that the primary place where I got into anything that Dr. Vogler said was finally picking out one or two sentences that she talked about, the fatality. Well, why wouldn't you have argued that to the jury? Well, Your Honor, I don't know. That's a strategic problem, I suppose. I do think that failure to show the substantial similarity is grounds for reversal. We've cited several cases that way, Barker v. Deere. There's a case that used primarily statistical evidence of dissimilar incidents. Another is Drabik v. Stanley Bostitch. The case that Louie v. Remington talked about, the fact that it is the jury's job to weigh the evidence, but it's the judge's job to decide which evidence gets on the table. Here there was this overwhelming. If Consumer Reports did open the door, it didn't open it very far, and there was this overwhelming several hours of statistics involving hundreds of thousands of crashes or millions of crashes. It's every fatal crash in the United States. Well, how do you think Consumer Reports opened it? Why? I mean, I'm not an expert on automobiles, but I had an impression from reading the article that, you know, this was a dangerous vehicle, and I must have somehow gotten that from Consumer Reports. Well, this vehicle has been in the news for many reasons. More recently, this was a 1988 Consumer Reports article. I see. It was at the time they were designing the Explorer, and it caused a furor at Ford. They were trying to decide, what will we do with this vehicle? We're calling it the Bronco II. It was called in their documents prior to that the 1990-and-a-half Bronco II. After that article, it became the Ford Explorer. There were memos relating to that visit to Consumer Reports. If that article mentions fatality rates and compares them at all, talking about the Bronco II, not the Explorer, it was we were trying to show that Ford must learn from this, must learn from their experience with the Bronco II to design the Explorer. But some people might call it a historical document. It was a historical document about the Bronco II. Thank you, Your Honor. And with that, I think I'm out of time. If you don't have any further questions, I thank you. Thank you, Judge. May I add this much? This was a close case. And if it had even resulted in a hung jury, we'd be going back for another trial. I think the Jaramillo family deserved that chance. Thank you. Thank you, Judge. Thank you both very much. It was a very helpful argument. We appreciate it. The case just argued will be submitted. The next case on the calendar is Ricci v. Volvo.
judges: Reinhardt, Noonan, Paez